Filed 5/23/16  Gilmore v. Commission on Professional competence CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| REVA GILMORE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COMMISSION ON PROFESSIONAL COMPETENCE,<br><br>    Defendant and Respondent;<br><br>PALO VERDE COMMUNITY COLLEGE DISTRICT,<br><br>    Real Party in Interest and Respondent. | D069095<br><br><br>(Super. Ct. No. BLC1400012) |


APPEAL from a judgment of the Superior Court of Riverside County, David M. Chapman, Judge.  Affirmed.


Reich, Adell & Cvitan, Marianne Reinhold, Carlos R. Perez, and Angela Serranzana, for Plaintiff and Appellant Reva Gilmore.

McCune & Harber, Heather M. Bean and Grace H. Kang, for Defendant and Respondent Commission on Professional Competence and Real Party in Interest and Respondent Palo Verde Community College District.

Reva Gilmore was a community college instructor for the Palo Verde Community College District (the District). She appeals the trial court's denial of her petition for a writ of administrative mandamus to set aside the decision by the Commission on Professional Competence (the Commission) to uphold her dismissal by the District. Gilmore contends the trial court failed to apply the applicable independent judgment standard, the stated grounds for dismissal were unfounded and it actually was due to financial reasons, and the administrative law judge (ALJ) abused its discretion in declining to impose lesser discipline. We find the trial court appropriately applied its independent judgment, Gilmore fails to establish any absence of evidence to support her dismissal or financial motive, and there was no abuse of discretion by the ALJ. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND[1]

I. *Background*

Gilmore was an instructor in the office administration (OFA) program at Palo Verde College (the College). As of Fall 2009, she was the only OFA instructor. Gilmore has rheumatoid arthritis, which limits her ability to complete certain tasks, including writing. The District provided Gilmore with an instructional aide and this arrangement

---

[1] Consistent with our substantial evidence review, discussed *post*, we present the evidence in the light most favorable to affirmance.

was memorialized in an agreement following a dispute not at issue here. Callista La Vigne was her aide from Fall 2009 through March 2010, followed by Teresa Gomez from March 2010 through April 2010.

## II. *Events Leading to Dismissal*

### A. *Update to the OFA Program*

Gilmore prepared a regularly scheduled five-year review of the OFA program during the 2007-2008 academic year. Relevant here, Gilmore addressed enrollment (including a significant decline in Spring 2007, followed by an increase in Fall 2007) and her efforts to increase it. The District's Board of Trustees (Board) approved the review.

The OFA program was suspended for the 2008-2009 academic year, due to concerns regarding low enrollment (and other issues, including those noted in Gilmore's five-year review) and the suspension was intended to revive the program. The District directed Gilmore to update the OFA curriculum for the 2009-2010 academic year and relieved her of teaching duties for the 2008-2009 year so she could do so. According to Dean of Career Technical and Continuing Education George Walters, Gilmore returned with a box of unorganized materials, including copies of the OFA portions of other community college catalogs, job descriptions, and course outlines that he felt required "extensive work with the division." She did not provide a report, written recommendations or student learning objectives, or a list of needed equipment.

In May 2009, Vice President of Instructional Services William Smith wrote to Gilmore to advise her that her work did not "constitute a complete OFA program" and she had "failed to finish the task . . . ." He noted the update had been prompted by her

3

five-year review. He explained she would have a lighter than average teaching load in Fall 2009 to provide time to complete the project (and identified the four courses she would teach), described the remaining work, and stated it should be completed no later than the October 2009 curriculum meeting.[2]

Based on conversations with Smith and Walters, and the lack of documents evidencing an update, District President and Superintendent James Hottois felt Gilmore had not completed the assignment. The District hired a consultant, Katherine Maschler, to assess the OFA program. Maschler's report found the College had a disproportionately large number of OFA courses compared to other California community colleges. She offered suggestions for a "possible restructuring of [c]ertificates, . . . elimination of some courses and proposals for new ones," as well as regarding classroom configuration, course materials and descriptions, updated equipment (including PC computers, rather than Macintosh computers (Macs)), and student learning objectives.

OFA courses were not offered during the 2010-2011 or 2011-2012 academic years.

B. *Tardiness and Absences*

On September 2, 2009, Smith sent Gilmore a memorandum noting she arrived to an academic senate meeting after it adjourned and was 30 minutes late to a business division meeting. Smith also reminded her about an e-mail he sent in 2008 stating she

---

[2]     Gilmore states she had a full teaching load in Fall 2009, but her cited testimony reflects she taught the four courses in Smith's letter and Attaway's input, discussed *post*, suggests she may only have had three courses that semester.

was not excluded from required meetings. That same day, Gilmore missed a faculty/staff meeting, resulting in another memorandum from Smith on September 4; in an undated response, she indicated she was unable to attend due to medical issues. She also was tardy to other meetings that month (remarking, on one occasion, that the clocks were wrong).

On January 20, 2010, Smith sent Gilmore a letter regarding her being 28 minutes late to a class on January 13, 2010, stating in part, "[a]s you have been made aware in the past, this tardiness is completely unacceptable." Smith had asked Dean of Distance Learning Vicky Attaway, whose office was near Gilmore's classroom, to note when she arrived at work during the 2009-2010 year. For Fall 2009, Attaway reported Gilmore had one absence, as well as eight late arrivals with respect to two classes, but she did not recall late arrivals (if any) for a third class. For Spring 2010, Attaway documented that Gilmore missed the first day of class, had another absence, and arrived late on 35 out of 90 days.[3]

C. *Grading*

The District also had concerns about Gilmore asking her instructional aides to evaluate student work, which it viewed as a violation of state law and District policy.

These issues came to the fore when Gomez became Gilmore's aide in March 2010.

---

[3] Attaway apparently prepared a document to track attendance during both semesters, but the Fall 2009 document was not produced in discovery or entered into evidence.

Prior to Gomez commencing work, Walters met with her, Richard Soto (her union representative), Gilmore, and Victor Hernandez (Gilmore's representative) to discuss the work Gomez was permitted to do. According to Gomez, Walters told Gilmore that Gomez would not be able to grade papers, it was clearly communicated what grading entailed, and Gilmore stated she was not going to have Gomez grade anything. Gomez also reported Walters explained the process Gilmore had to follow if she wanted Gomez's help; namely, she had to be present and tell Gomez what to write on the papers.

Gomez said Gilmore nevertheless asked her to grade shortly after she began working for her and then daily (Monday through Thursday). She told Gilmore she could not do so and advised Walters "often" about what was occurring. Walters e-mailed Gilmore on April 15 to remind her that it was her responsibility, not that of her aide, to ensure grading and proofing were current. Walters forwarded the e-mail to Gomez on April 20 and directed her: "do not grade, evaluate, proofread, or assess any student work." He explained it was "perfectly ok to sit next to the instructor while she is assessing, proofreading, evaluating, or grading student work so you can write the comments on the student's work as the instructor tells you." Gomez stopped working with Gilmore at the end of April 2010.

Gilmore fell behind on grading, resulting in the District paying two instructors to grade work for her at the end of Spring 2010.

III. *Disciplinary Action*

On March 15, 2010, Smith sent Gilmore a Letter of Reprimand for repeated tardiness, among other things, and indicated the District intended to suspend her for one

6

day. He noted she had failed to improve her tardiness in the five months since her initial reprimand. Hottois subsequently advised Gilmore the Board approved a one-day suspension without pay.

On October 27, 2010, Hottois sent her a Notice of Proposed Recommendation to Immediately Suspend Without Pay, Dismiss, and First Amended Statement of Charges. He identified five grounds, including three relevant here: evident unfitness for service, persistent violation of, or refusal to obey, applicable school laws and community college regulations, and willful refusal to perform regular assignments without reasonable cause. After discussing her history of prior discipline (including her failure to update the OFA curriculum), it identified several "reasons for action," focusing on her tardiness and grading practices. The Board approved this recommendation. On December 14, 2010, the District notified Gilmore she was suspended without pay.[4]

IV. *Administrative Hearing and Decision*

Gilmore objected and requested a hearing. The hearing took place over 10 days and, relevant here, District witnesses elaborated on their issues with Gilmore's conduct, while she explained her actions. We summarize briefly.

First, with respect to the OFA update, Walters referenced course outlines, degree programs, and possibly technology as traditional items that need to be updated. He observed Gilmore's technology, including old Mac computers, was outdated and not supported by the College, which used PC's. William Ponder, a computer and business

---

[4] Gilmore had already been on a paid leave since August 2010, when a doctor conducted a mental health examination and determined she was not fit for duty.

7

instructor and the contract negotiator for the College's California Teachers Association (CTA) chapter, agreed that updating OFA would include equipment.[5] Walters also noted they had hoped to receive a report from Gilmore, akin to what Maschler produced, but did not.

Gilmore testified her understanding was that they wanted her to "research [and] present it to [her] advisory committee." She explained she researched every community college in California, went to business sites, obtained their job openings, and reviewed the duties and skills they required of employees, met with her advisory committee twice (and e-mailed with them once or twice), and prepared new and updated course outlines. The advisory committee members provided suggestions, including to add a customer service class, which she took. She noted she was never directed to prepare a report.

Next, regarding tardiness and absences, Walters testified that during the relevant time period, Gilmore was late to meetings "more than not." He stated her tardiness did not improve and she never took responsibility; instead, there "was always a reason." Ponder observed her meeting attendance was sparse at best and, when she did attend, she arrived late and left early. Former Vice President of Administrative Services Geri Butler noted in a declaration that Gilmore was routinely late to staff meetings by 20 minutes.

Gilmore's instructional aides corroborated Attaway's input on class attendance. La Vigne testified Gilmore was punctual between 25 to 30 percent of the time to her Fall

---

5     The District presented Ponder's testimony in a declaration. This declaration, and those discussed below, were admitted on an administrative hearsay basis. In an administrative hearing, "[h]earsay evidence may be used for the purpose of supplementing or explaining other evidence. . . ." (Gov. Code, § 11513, subd. (d).)

8

2009 keyboarding and customer service classes and 20 to 25 percent of the time to her Spring 2010 business math and master student classes. With respect to the first day of the Spring 2010 semester, La Vigne explained Gilmore arrived approximately 30 to 40 minutes late, at which point she had already sent the students home. Gomez testified Gilmore was on time approximately 30 to 40 percent of the time to the Spring 2010 business math and master student classes.

Gilmore testified "I know that I was tardy but no one ever—no one ever came and spoke to me and just chatted with me. . . ." She agreed she had provided excuses for her tardiness, including being stuck in traffic and behind sheep. She also acknowledged she did not take remedial actions every day, such as leaving her house early; however, she explained she "did try to leave early but things happen." Hottois, who lived near Gilmore, testified there was "almost no traffic," other than an occasional farm vehicle or sheep once or twice a year.

Finally, on grading, Hottois testified that instructional aides cannot evaluate student work under the Education Code. He indicated he reviewed this position with the academic senate, the CTA, and the staff union, and there was no disagreement. Walters agreed that grading by aides was against the academic senate's standards. Attaway likewise testified it was not allowed. She also clarified what grading involved; namely, going over assignments and making sure they are correct or if they need to be revised.

With respect to the March 2010 meeting regarding Gomez's duties, Walters testified he made clear that no aide could grade papers outside Gilmore's presence and she acknowledged she understood. Soto explained his understanding was that Gilmore

9

had to sit with Gomez to "mark up the papers or whatever goes along with grading" and that Gilmore did not "appear to be confused" as to Gomez's duties. Hernandez provided input by declaration and agreed that in order for Gomez to assist, Gilmore had to sit near her and tell her what to write. He further stated it was established Gomez could not make decisions as to grades or "determine which answers were right and wrong" and that Gilmore appeared to understand and did not object. Gomez testified Walters's April 15 e-mail to Gilmore matched what he told her during the meeting. Gilmore's recollection of the meeting was that they said Gomez could proofread, Gomez said "no problem," and there was no discussion regarding what proofreading would entail.

La Vigne and Gomez confirmed Gilmore requested they grade student work. La Vigne stated that the "majority of the time," Gilmore did not sit with her to evaluate student work; "once or twice [they] went over the information together. Then after that no." She acknowledged she would return assignments to Gilmore, at least on certain occasions, and Gilmore took work home "at times." She felt she was evaluating their work. Gomez acknowledged Gilmore used the word "proofing," but she understood that to mean grading. Walters recalled speaking to Gilmore about the grading issue "six, seven, eight times at a minimum, whether it be in writing or face to face."

Gilmore acknowledged she had her aides proofread, but said she would verify the work and that this practice was compliant with the Education Code. She testified Walters advised her by e-mail that she had to sit next to the aide. She then attempted to correct work in that manner "one time," but found it was not feasible, explaining: "it took an hour and I had—to sit there, read the question to her one or two times and then read the

10

answer, each word word [*sic*] by word for her to write down. . . ."  She denied telling Gomez to grade, but acknowledged saying she did not have "time to sit with her."  She also explained the reasons she fell behind on grading, including "admin decid[ing] that my aide could no longer do the work they did before" and having distance learning classes, which required more work.

The ALJ issued its decision in December 2014.  It found each issue constituted a willful refusal to perform regular assignments without reasonable cause under Education Code[6] section 87735 and persistent violation of, or refusal to follow, state law and District guidelines under section 87732, subdivision (f), and supported dismissal on those grounds.  The ALJ also found her conduct demonstrated evident unfitness for service and warranted dismissal under section 87732, subdivision (d).  It determined dismissal was the appropriate penalty.  We discuss these findings in more detail, *post*.

V.  *Administrative Mandamus Petition and Ruling*

Gilmore filed a petition for a writ of administrative mandamus under Code of Civil Procedure section 1094.5.  She contended the ALJ committed a prejudicial abuse of discretion, on the grounds the findings and evidence did not support her dismissal.  The trial court denied the petition.  The court observed it exercises its independent judgment in reviewing the evidence, must afford a strong presumption of correctness to the administrative findings, and that Gilmore bore the burden of establishing those findings were contrary to the weight of the evidence.  It found she failed to do so.  It further noted

---

6       All further statutory references are to the Education Code unless otherwise noted.

11

the ALJ found sufficient evidence to support dismissal on the second through fourth grounds, observing Gilmore ran OFA for many years and identifying the conduct supporting termination as the failure to update the program, tardiness and absences, and failure to personally grade student work. Finally, the court explained it upholds the penalty determination unless there is a manifest abuse of discretion and that the decision to terminate Gilmore was not one. The court entered judgment and Gilmore appealed.

## DISCUSSION

### I. *Legal Principles*

A. *Standards Governing Dismissal*

A community college may dismiss a regular or academic employee for one of several reasons, including "[e]vident unfitness for service" and "[p]ersistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the . . . governing board of the community college district employing him or her." (§ 87732, subds. (d), (f).) It may also suspend and dismiss an employee for "willful refusal to perform regular assignments without reasonable cause." (§ 87735.)[7] The ALJ determines whether there is cause for dismissal and the "precise penalty to be imposed." (§ 87680.)

B. *Review by the Trial Court*

"Section 1094.5 of the Code of Civil Procedure governs judicial review by administrative mandate of any final decision or order rendered by an administrative

---

[7] For ease of reference, we collectively refer to the latter two factors, where appropriate, as "willful and persistent refusal."

12

agency. . . . If the administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence. [Citations.]' " (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313.) Gilmore had a fundamental vested right in her employment, requiring independent judgment review. (See *Spanner v. Rancho Santiago Community College Dist.* (2004) 119 Cal.App.4th 584, 587, 591 (*Spanner*) [long-term classified employee had a "fundamental, vested right in his permanent employment"]; *San Dieguito Union High School Dist. v. Commission On Professional Competence* (1985) 174 Cal.App.3d 1176, 1190 [fundamental right at issue was a teacher's right to "practice her profession and earn her livelihood"]; see also § 87682 ["The court, on review, shall exercise its independent judgment on the evidence."].)

The trial court "weigh[s] the evidence, resolving on its own any conflicts," and is "free to make its own determination of the credibility of the witnesses. . . ." (*Pittsburg Unified School District v. Commission on Professional Competence* (1983) 146 Cal.App.3d 964, 976-977.) However, "[i]n exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).)

"Review of the penalty determination, however, traditionally differs from the review of the evidence and factual findings. The superior court upholds the penalty determination of the agency or arbitrator, unless there has been a manifest abuse of

13

discretion." (*West Valley-Mission Community College Dist. v. Concepcion* (1993) 16 Cal.App.4th 1766, 1778-1779.)

C. *Review on Appeal*

" 'After the superior court makes an independent judgment upon the record of an administrative proceeding, [the] scope of review on appeal is limited.' [Citation.] We must sustain the trial court's findings if they are supported by substantial evidence.' " (*San Diego Unified School Dist. v. Commission on Professional Competence* (2011) 194 Cal.App.4th 1454, 1461.) "On substantial evidence review, we do not 'weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it.' " (*Do v. Regents of the University of California* (2013) 216 Cal.App.4th 1474, 1492 (*Do*).)

We "will not disturb the penalty imposed ' "unless it is shown to have been a manifest abuse of discretion." [Citation.]' " (*Spanner*, *supra*, 119 Cal.App.4th at p. 591; see *West Valley-Mission Community College Dist.*, *supra*, 16 Cal.App.4th at p. 1779 ["The appellate court uses the same standard as the superior court, reviewing the arbitrator's penalty for manifest abuse of discretion."].)

II. *Analysis*

A. *There Were No Errors in the Trial Court's Review*

Gilmore does not contend she requested a statement of decision from the trial court or that it provided one. As a result, she has waived the issuance of factual findings by the trial court. (Code Civ. Proc., § 632; Cal. Rules of Court, rule 3.1590; *Hall v. Bureau of Employment Agencies* (1976) 64 Cal.App.3d 482, 496 (*Hall*) ["Findings of fact

14

and conclusions of law were not requested in the trial court. Under Code of Civil Procedure section 632 and [former] rule 232[] [current rule 3.1590] of the California Rules of Court at the superior court level, such factual findings and legal conclusions were waived."].) All statutory references in this section refer to the Code of Civil Procedure.

Section 632 provides that "[i]n superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law *shall not be required*," although upon the timely request of a party, the court must issue a "a statement of decision explaining the factual and legal basis for its decision." (§ 632, italics added.) Section 632 applies in section 1094.5 administrative mandamus proceedings. (See *Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67 (*Kazensky*); *Milligan v. Hearing Aid Dispensers Examining Com.* (1983) 142 Cal.App.3d 1002, 1004, fn. 3.)

Here, the court correctly identified the independent judgment standard in its ruling. Further, because there was no statement of decision, we presume the court exercised its independent judgment. (See *Fukuda*, *supra*, 20 Cal.4th at p. 812 ["[F]indings by the trial court [having] been waived, . . . '[i]t must be conclusively presumed on this appeal that the *trial court weighed the evidence giving due weight to the presumption in favor of the board's findings, but nevertheless, exercising its independent judgment*,' " reached its finding].) We also " 'must infer every finding of fact supporting the judgment so long as it is warranted by the evidence. [Citations.]' " (*Bledsoe v. Biggs Unified School Dist.* (2008) 170 Cal.App.4th 127, 134 (*Bledsoe*); *Veguez v. Governing*

15

*Bd. of the Long Beach Unified School Dist.* (2005) 127 Cal.App.4th 406, 421 (*Veguez*) [accord].)[8]

Gilmore's arguments to the contrary are unpersuasive. First, she contends that an error in the trial court's description of the ALJ's findings reflects a failure to exercise independent judgment. Specifically, she notes the court stated the decision was based on the "second through fourth" grounds, while the ALJ found no evidence to support the third ground (a physical or mental condition rendering her unfit). However, this appears to be nothing more than a typographical error, as the court correctly identified the conduct on which dismissal was based. It does not establish an absence of independent judgment.

Next, Gilmore contends that factual findings are necessary for independent review, but fails to address the absence of a statement of decision. We find that absence dispositive, for the reasons discussed *ante*. Nevertheless, we briefly address her position. The cases on which she relies confirm the trial court must exercise its independent judgment, not that it must explain the factual findings underlying its determination. (See *Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 45 [trial court must "arrive at" its own independent findings]; *Barber v. Long Beach Civil Service Commission* (1996) 45 Cal.App.4th 652, 658-659 [trial court failed to apply independent review where

---

8     We note the trial court's judgment found substantial evidence to support the ALJ's decision. Nevertheless, given the court's correct identification of the standard in its ruling and the absence of a statement of decision (or any argument by Gilmore regarding the impact, if any, of this finding), we find it does not undermine the presumption the court exercised its independent judgment.

16

it stated it was unable to reweigh credibility or evidence]; *Guymon v. Board of Accountancy* (1976) 55 Cal.App.3d 1010, 1015 [under independent judgment review, "California fixes responsibility for factual determination at the trial court"]; *Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67, 69 ["trial court's duty is to undertake an independent review of the evidence"].)  In turn, her effort to distinguish *Dare v. Board of Medical Examiners* (1943) 21 Cal.2d 790 on the grounds that formal findings were required here also is unsuccessful; they were not.  (See *id*. at pp. 798-799 ["If there is no requirement for formal findings and none are made, findings in favor of the prevailing party are implied from the determination of the board."]; see also *Bechtel v. Board of Retirement* (1980) 102 Cal.App.3d 9, 14 ["Since in this case findings of fact were not requested and, thus, were waived (Code Civ. Proc., § 632), findings in favor of the respondent must be implied."]; *Bledsoe*, *supra*, 170 Cal.App.4th at p. 134; *Veguez*, *supra*, 127 Cal.App.4th at p. 421.)

B. *Substantial Evidence Supports the Trial Court's Ruling*

We first address the willful and persistent refusal findings and then turn to unfitness for service.

1. *Willful and Persistent Refusal*

a. *OFA Program*

The ALJ found Gilmore failed to update the OFA program.  It noted she argued she "adequately completed the task," but the evidence did not reflect such.  It further observed she did not update the program in a "professional manner," including failing to

17

provide written recommendations. It concluded this conduct established both willful and persistent refusal and supported dismissal on those grounds.

Substantial evidence supports these findings. First, although it appears the parties direct us to no cases interpreting the meaning of "willful refusal to perform regular assignments without reasonable cause" under section 87735, case law from related settings reflects that declining to obey an employer's directions, without reason, is sufficient to establish willful refusal. (See, e.g., *Wilbur v. Office of City Clerk* (1956) 143 Cal.App.2d 636, 642 [observing an employee who "did not attribute his refusals to illness" and made "no showing before the hearing examiner of willingness to comply with the reasonable orders of his superiors," demonstrated "wilful refusal to obey the reasonable orders of an employer"].) While Gilmore testified about the efforts she took to update OFA and made some attempt to explain her actions (indicating, for example, that no one requested a written report), the record reflects she failed to update the program to the District's satisfaction—even after Smith advised her that her work was inadequate. This evidence supports a finding of willful refusal. (§ 87735.)

Second, the evidence reflects Gilmore's conduct establishes a "[p]ersistent violation of, or refusal to obey" the District's rules. (§ 87732, subd. (f).) "The refusal of a teacher to accept an assignment which the school authorities have the power to make constitutes a violation of school laws. . . ." (*Board of Education v. Swan* (1953) 41 Cal.2d 546, 551, disapproved on other grounds by *Bekiaris v. Board of Education* (1972) 6 Cal.3d 575, 587, fn.7.) Continuing or repeated refusal, as opposed to isolated behavior, is sufficient to establish persistent conduct. (*Governing Board of the Oakdale Union*

18

*School Dist. v. Seaman* (1972) 28 Cal.App.3d 77, 82 [persistent "has been interpreted to mean 'continuing or constant' "]; compare, e.g., *San Dieguito Union High School Dist. v. Commission on Professional Competence* (1982) 135 Cal.App.3d 278, 287 ["Without question a persistent refusal to prepare lesson plans for substitute teachers . . . might be sufficient to constitute 'persistent violation . . . of school rules' "]; *Governing Bd. of Ripon Unified School Dist. v. Commission on Professional Competence* (2009) 177 Cal.App.4th 1379, 1388 [finding persistent refusal to obtain a required certification was a lawful ground for termination]; with *Fresno City High School Dist. v. De Caristo* (1939) 33 Cal.App.2d 666, 675 ["two absences without leave may not be said to be a persistent course of conduct"], italics omitted.)  Here, although the OFA program update arguably could be viewed as a single project, the evidence establishes Gilmore's persistent refusal to complete it over an extended period of time.  (§ 87732, subd. (f).)

Gilmore disagrees the evidence supports these conclusions.  First, she contends her five-year review was approved by the Board of Trustees.  This is immaterial.  The record, including Smith's May 2009 letter to Gilmore, shows the results of that review contributed to the District's decision to revamp the OFA program, reflecting they were separate processes with different goals.

Second, she argues she did spend the 2008-2009 academic year updating the program, was not disciplined at the time for failing to do so, and Maschler's report recommended only "cosmetic" changes.  However, witnesses testified Gilmore had not completed the OFA update consistent with expectations and Maschler ultimately produced the desired result.  In contending she actually did update the program and

19

criticizing Maschler's report, Gilmore asks us to reject the opinions of these witnesses in favor of her own. We will not revisit credibility determinations. (*Do, supra*, 216 Cal.App.4th at p. 1492.) As for discipline, Hottois testified Gilmore was verbally counseled and he believed the counseling would have been by Smith. Smith's May 2009 letter also alerted her that her work was inadequate.

Third, she claims the OFA issue was not in the statement of charges, implying (but not stating) this was not a valid basis for dismissal. As an initial matter, the October 27 letter does include the OFA update, but in the history of prior discipline, rather than the "reasons" section (and with the parenthetical "We discussed making this a charge.").[9] More importantly, Gilmore fails to articulate her challenge or identify legal authority to support it. We find she has waived it. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*) [observing it is not the reviewing court's role to "construct a theory" for appellant: "[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived. . . ."].) The situation also does not raise any fairness concerns, generally. The October 27 letter identified the OFA update as an issue and Gilmore was able to present evidence and argument on the matter. (See, e.g., *Stearns v. Fair Employment Practice Com.* (1971) 6 Cal.3d 205, 213 ["So long as the respondent is informed of the substance

---

9      Gilmore claims Hottois testified the District was not seeking to terminate her based on the OFA update and it was not in the statement of charges. His actual testimony is more equivocal. When asked by Gilmore's counsel to explain the parenthetical, he answered "I don't—I really don't recall where that came from." Only after Gilmore's counsel responded with "Okay. Can we assume that this is not a charge then?" did Hottois answer "Yes."

of the charge and afforded the basic, appropriate elements of procedural due process, he cannot complain of a variance between administrative pleadings and proof"; observing respondent had "ample time to prepare a defense" on the matter at issue and "did in fact present evidence."].)[10]

Finally, Gilmore states she would not have appealed if the court had addressed the OFA update in its order. In the absence of a statement of decision, we presume the trial court both considered and rejected her position on this issue. (Code Civ. Proc., § 632; Cal. Rules of Court, rule 3.1590; *Fukuda*, *supra*, 20 Cal.4th at p. 812.) In turn, we could view her statement as conceding the OFA update supports dismissal. Regardless, her contentions are meritless, for the reasons discussed *ante*.

---

[10]    But see *Brooks v. State Personnel Bd.* (1990) 222 Cal.App.3d 1068, 1074-1075 (finding *Stearns* inapposite to whether a university could amend a notice of dismissal under the Ed. Code).

b. *Tardiness and Absences*

The ALJ found Gilmore was "absent from and tardy to meetings and classes throughout the time at issue," noting Smith's memoranda to Gilmore, Attaway's records, and the testimony of La Vigne, Gomez, Attaway, and Walters. It acknowledged she contested these accounts, but found the other witnesses more credible. It also found unpersuasive her contention the District failed to inform her that tardiness was a problem, finding she should have been aware it would not permit this conduct on a regular basis. The ALJ concluded that although the individual instances of tardiness appeared to be de minimis, the conduct "taken as a whole" supported dismissal.

Substantial evidence supports these findings. Witnesses testified that Gilmore's job duties required her to be in class on time and to attend required meetings. Gilmore does not dispute these requirements; indeed, she acknowledged at the hearing that "fail[ure] to arrive on time . . . to begin [her] class" would be a "violation of [her] responsibilities to the college and to [her] students." She also acknowledges her tardiness (simply contesting the extent of this conduct, as we discuss *post*) and makes no attempt in her briefing to justify her behavior. Although the District does direct us to some of her excuses (e.g., sheep on the road), we find them insufficient to establish reasonable grounds for tardiness. There is ample evidence to support willful refusal under section 87735.

As for persistent refusal, the evidence likewise reflects Gilmore repeatedly violated tardiness and attendance rules, even after she was counseled. (§ 87732, subd. (f); see *Blake v. Commission on Professional Competence* (1989) 212 Cal.App.3d 513,

22

515, 518 [affirming denial of writ petition by teacher following her dismissal for persistent refusal to follow regulations (among other issues), arising from conduct including chronic tardiness]; *Board of Education v. Mathews* (1957) 149 Cal.App.2d 265, 272 [affirming dismissal of a teacher who was absent for 10 consecutive days during one October, continued to be absent without excuse until February, and refused to return to her duties when ordered to do so]; cf. *Drysdale v. Department of Human Resources Development* (1978) 77 Cal.App.3d 345, 356-357 ["recurring . . . tardiness after repeated admonition" held to be willful misconduct warranting denial of unemployment benefits].)

Gilmore admits she was tardy at times, but questions the evidence establishing the frequency of this conduct and contends the District failed to give her sufficient opportunity to correct the behavior. Neither argument succeeds.

First, Gilmore's challenges to the evidence (such as questioning Attaway's completion of her chart in "ten minutes" and citing a statement by Gomez that Gilmore was on time to class) go to witness credibility. We will not reweigh credibility (*Do*, *supra*, 216 Cal.App.4th at p. 1492), but do note that conflicting evidence, even by the same witness, does not preclude a finding of substantial evidence. (*People v. White* (2014) 230 Cal.App.4th 305, 319, fn. 14 ["[U]nder the principles governing review for the existence of substantial evidence, the testimony of a witness is ordinarily sufficient to uphold a judgment 'even if it is contradicted by other evidence, inconsistent or false as to other portions. [Citations.]' "]; see also *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67 ["It is well settled that the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted."].)

23

Second, the record reflects the District did provide Gilmore with opportunities to correct her behavior, including the September 2009 and January 2010 memoranda, and she did not improve. Her claim that she was not counseled on tardiness to class until January 2010 lacks force, as she continued to be tardy throughout Spring 2010. Likewise unpersuasive is her complaint that no one met with her; she identifies no District policy or legal authority that discipline must be in person. Regardless, she should have been aware regular tardiness was not acceptable prior to January 2010 (notwithstanding what she characterizes as "lax enforcement") and certainly after that time.

### c. *Grading*

The ALJ found Gilmore had La Vigne grade student work and repeatedly asked Gomez to grade, even after Gomez indicated she was not permitted to do so. The ALJ observed that in each case Gilmore called grading "proofreading," but never adequately defined what she meant by the term. It also found her conduct violated section 88244, subdivision (a), which provides that aides' duties "shall not include assignment of grades to students." It concluded that Gilmore's "insistence that her aides grade her students' work" constituted willful and persistent refusal supporting termination.

Substantial evidence supports these findings. Attendees at the March 2010 meeting regarding Gomez's duties agreed Walters told Gilmore that Gomez could not grade (but rather, that Gilmore had to sit next to Gomez and indicate the answers) and that Gilmore acknowledged she understood. Although Gilmore's recollection differed, the ALJ and trial court were entitled to credit the other witnesses. Moreover, there is no question that by Walters's April 2010 e-mail, Gilmore was aware of his expectations; at

24

that point, she simply deemed them not feasible and declined to comply. Even setting aside Gilmore's grading practices prior to March 2010, her refusal to follow Walters's directions after that point is sufficient to constitute willful refusal. (§ 87735.)

Witnesses likewise testified that having aides evaluate students was a violation of both District policy and section 88244, supporting the finding that Gilmore's conduct also constituted persistent refusal to follow those guidelines. (§ 87732, subd. (f); see also § 88244; *Saraceno v. Foothill-De Anza Community College Dist.* (1982) 127 Cal.App.3d 850, 860 [observing that under the Ed. Code, the certificated instructor decides which tasks require certification, and that "[t]he only express statutory limitation upon that determination is that the instructional aide shall not assign grades to students . . . ."].)

Gilmore contends her grading practices cannot support dismissal because the District purportedly acquiesced in her conduct for over a decade and she modified her behavior after receiving a directive from the District. We disagree. First, even if the District only recently clarified its expectations regarding grading, that does not justify her failure to comply with Walters's directions once he did provide that clarification. We also find unpersuasive her claim that the District had acquiesced because her conduct was consistent with section 88244 and the job duties of aides. Although she claims section 88244 "prohibits an instructional aide from issuing final class grades to students," it actually states that an aide's duties "shall not include assignment of grades to students," with no limitation to final grades. Gilmore also identifies no authority to support her interpretation (which Hottois disagreed with) and witnesses testified her conduct violated *District* standards, regardless. As for job duties, she cites a job description with entries

25

including "Collect daily assignments—check for completeness" and "Assist slow learners - individually or in small groups."  Neither these entries, nor anything else in the description, suggest it is appropriate to have aides evaluate student work.  Second, Gilmore's own testimony establishes she did not change her behavior and, to the contrary, attempted to follow Walters's directions only once.[11]

2.  *Unfitness for Service*

The ALJ also found Gilmore's conduct reflected unfitness for service under section 87732, subdivision (d), pursuant to the standards established in *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 (*Morrison*) and *Woodland Joint Unified School District v. Commission on Professional Competence* (1992) 2 Cal.App.4th 1429 (*Woodland*).

First, the *Morrison* factors "must be analyzed to determine, as a threshold matter, whether the cited conduct indicates unfitness for service."  (*Woodland*, *supra*, 2 Cal.App.4th at p. 1445.)  Those factors are:

> "[T]he likelihood that the conduct may have adversely affected students or
> fellow teachers, the degree of such adversity anticipated, the proximity or
> remoteness in time of the conduct, the type of teaching certificate held by
> the party involved, the extenuating or aggravating circumstances, if any,
> surrounding the conduct, the praiseworthiness or blameworthiness of the

---

11    Gilmore contends that if there was insufficient basis for the willful refusal charge, she would be entitled to back pay, relying on *Von Durjais v. Board of Trustees* (1978) 83 Cal.App.3d 681 and *West Valley-Mission College*, *supra*, 16 Cal.App.4th at p. 1780. Because there is substantial evidence to establish willful refusal, neither case supports her position.  (See *Von Durjais*, at p. 687 [dismissed employee was entitled to back pay because she was cleared of charges supporting suspension without pay]; *West Valley-Mission College*, at pp. 1780-1781 [distinguishing *Von Durjois* because employee had engaged in conduct that could "support a suspension without pay" under § 87735].)

26

motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers." (*Morrison, supra*, 1 Cal.3d at p. 229.)

The ALJ found the *Morrison* factors reflected unfitness for service. It identified adverse effects of Gilmore's conduct (noting the harm to students who wished to take OFA courses and to the teachers retained to complete her grading) and that the degree of this adversity weighed against her.[12] It found the conduct was not remote. It noted extenuating circumstances, observing Gilmore was a long-term educator with a good reputation. With respect to motives, it found no basis for praiseworthiness and that the responsibility fell "squarely" with her. It viewed the likelihood of recurrence as great, given her failure to accept that responsibility and apparent belief she did nothing wrong. Finally, it found dismissal would not adversely impact or have a chilling effect on her or other teachers.

We find substantial evidence supports these findings and Gilmore does not contest most of them. (*Ordorica v. Workers' Comp. Appeals Bd.* (2001) 87 Cal.App.4th 1037, 1046 [we accept as true "factual findings which are undisputed . . . ."].) She does contend the ALJ failed to consider her disability as an extenuating factor. However, the record reflects the ALJ was aware of her disability, as it noted the District provided reasonable accommodations (use of an aide and afternoon class times) and it found no evidence the District's actions were due to the disability. More importantly, Gilmore fails to explain

---

12    The record reflects other adverse effects as well, including the students' loss of teaching time.

how her disability would have prevented her from following the particular District orders at issue.[13]

The next step "is to determine whether the 'unfitness' is 'evident.' "  (*Woodland*, *supra*, 2 Cal.App.4th at p. 1445.)  " '[E]vident unfitness' . . . means 'clearly not fit, not adapted to or unsuitable for teaching, ordinarily by reason of temperamental defects or inadequacies' [and] connotes a fixed character trait, presumably not remediable merely on receipt of notice that one's conduct fails to meet the expectations of the employing school district." (*Id.*, at p. 1444.)  The ALJ determined Gilmore's actions constituted "events that demonstrated [her] evident unfitness for service."  It found she was aware of her obligations, failed to fulfill them, and refused to acknowledge those deficiencies, specifically criticizing her attempts to justify her conduct as lacking credibility and evidentiary support.  It also rejected her contention the District failed to provide notice and thus limited her ability to cure those issues, finding she could be "deemed to have understood" they were unacceptable.  The ALJ concluded her refusal to accept responsibility showed she did "not convincingly or genuinely admit that she could change

---

13      We note Gilmore does not address *Morrison* until her reply brief and we arguably could reject her extenuating circumstances argument on that ground alone. (*Tilton v. Reclamation Dist. No. 800* (2006) 142 Cal.App.4th 848, 864, fn. 12 (*Tilton*) ["[T]he issue was waived as to this court because it was noted only in appellants' reply brief, and not in their opening brief."].)  Nevertheless, because she does discuss disability as an extenuating circumstance in her opening brief, albeit without reference to *Morrison*, we elect to reject her argument on the merits.  We do deem waived her argument on reply that the District's alleged financial motives must be considered as part of the *Morrison* analysis (but separately address her other financial arguments, *post*).  (*Ibid.*)

28

and improve her conduct," reflecting a fixed, irremediable character trait and permitting the finding she was evidently unfit for service.

The record supports these findings as well. Gilmore's unwillingness to take responsibility is reflected in the documentary evidence, her testimony, and the testimony of other witnesses—not to mention in her appellate briefing, where she maintains she did update the OFA program, was not tardy as often as claimed, and had compliant grading practices. Gilmore already received notice of these issues and did not correct them; there is nothing in the record to suggest she is capable of doing so. (See *Woodland*, *supra*, 2 Cal.App.4th at pp. 1444, 1454; see also *Blair v. State Bar* (1989) 49 Cal.3d 762, 781-782 [attorney's "assertion that *no* discipline should be imposed shows that he does not recognize his problems and that he may not correct them."].)

Gilmore disagrees she was unfit for service, contending she did not receive "written notice of her deficiencies" until September 2009 and her paid leave at the outset of the 2010-2011 academic year left her with "no opportunity to show that she could correct any perceived faults." However, Gilmore contends she did update OFA, so it is unclear how having more time for that project could have impacted her results. As for her tardiness and grading, Gilmore continued the practices at issue during Spring 2010, after receiving guidance on the District's expectations and before her leave commenced in Fall 2010.

C. *The Record Does Not Support Gilmore's Financial Motives Argument*

Gilmore contends the District actually sought to dismiss her for financial reasons, including a desire to eliminate the OFA program. The ALJ rejected this claim, finding

29

her conduct supported dismissal (as discussed *ante*) and the evidence did not establish the District terminated her to eliminate the OFA program. We agree.

First, Gilmore identifies evidence that she contends reflects financial motives, including: (1) the OFA program operating at a loss, her salary comprising the bulk of its expenses (and being at the top of the pay scale), and the program purportedly being able to earn money if she were replaced with a new employee; (2) the cost of maintaining her Mac computers; and (3) references in Maschler's report to financial issues with OFA.[14] Most of these facts are uncontroversial, but they also do not establish any motive to eliminate OFA or Gilmore, particularly given the District's expenditure of time and resources to attempt to revive OFA. Gilmore also fails to identify any evidence the District considered replacing her with a lower-paid employee. In addition, Gilmore claims the District had to save money due to "gross mismanagement of funds." However, she relies solely on a November 2011 letter from the Accrediting Commission for Community and Junior Colleges, Western Association of Schools and Colleges, stating it "received information about the financial condition of the institution that gives it concerns about the stability of the institution." The letter makes no suggestion of fund mismanagement, and, in any event, postdates the relevant time period.[15]

---

14 Gilmore's claim about OFA running at a profit with a new employee may not account for benefits. Gilmore's counsel asked Hottois whether OFA could make money if "salary and benefits" were reduced to $46,000, but that figure appears to represent only salary under the CTA agreement.

15 In her reply brief, Gilmore also contends the OFA suspension and purported lack of direction or resources to update the program or its equipment evidence financial

Second, Gilmore contends the District "attempted to tie" OFA's revenue to her (by arguing her failure to keep the program current caused low enrollment) and ignored both a recent increase in OFA enrollment and declining enrollments in OFA community college courses throughout the region. It is unclear what District attempt she is referring to. In any event, the OFA issue here was her failure to complete the 2008-2009 update, not revenue or enrollment levels generally.

Next, and reaching the crux of her argument, Gilmore argues financial considerations can only justify terminating a permanent employee in the context of a reduction in force (RIF) (which would permit her to displace a more junior employee) and that by terminating her, the District was able to eliminate both the program and her high compensation. However, Gilmore provides no evidence to support her theory. Rather, she simply argues that instead of using Maschler's report to update the OFA program, the District "shut [it] down indefinitely" (although the cited testimony just reflects there was no OFA program during 2010-2011 or 2011-2012), that Hottois was aware of RIF procedures but elected not to use them, and that "an economically driven lay off . . . would have been more appropriate[] under the circumstances." In short, she asks us to draw inferences against the judgment based on her speculation, which we cannot do. (See *Do, supra*, 216 Cal.App.4th at p. 1492.) In the absence of such evidence, her reliance on authorities regarding RIF's likewise is misplaced. (See

motives. As noted *ante*, we do not address arguments raised for the first time on reply. (*Tilton*, *supra*, 142 Cal.App.4th at p. 864, fn. 12.)

§ 87743; *Cousins v. Weaverville Elementary School Dist.* (1994) 24 Cal.App.4th 1846, 1854.)

Finally, she contends the ALJ "failed to incorporate compelling evidence . . . of a clear financial motive" and claims, again, she would not have appealed the issue if the court had reviewed and rejected her theory of the case. The ALJ acknowledged and rejected her argument. As for the trial court, there is no statement of decision, so, again, we presume it also reviewed and rejected her position. (Code Civ. Proc., § 632; Cal. Rules of Court, rule 3.1590; *Fukuda*, *supra*, 20 Cal.4th at p. 812.).[16]

D. *The ALJ Did Not Abuse Its Discretion in Dismissing Gilmore*

Gilmore contends termination was not warranted, citing her long career, the District's alleged failure to provide notice and a chance to correct her conduct, that various charges were dismissed by the ALJ, and her disability. She also argues she was entitled to have these factors considered by the ALJ and court and to obtain findings on "whether these circumstances might justify something less onerous than termination." We find no abuse of discretion. (*Spanner*, *supra*, 119 Cal.App.4th at p. 591.)

---

[16] Gilmore also implies the District may have been motivated by discrimination, suggesting that "while this case is not a straightforward disability discrimination case, it nonetheless contains elements of disability discrimination that must be addressed." We disagree. She directs us to nothing in the record establishing she sought to prove discrimination (although we do note the ALJ found no discrimination, disability or otherwise). Gilmore cannot raise a discrimination claim for the first time on appeal. (*Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1399 [" '[I]ssues raised for the first time on appeal which were not litigated in the trial court are waived. [Citations.]' "].)

First, Gilmore identifies no authority to suggest the factors she identifies should mitigate the penalty here. The only cases she does cite are disability discrimination cases and she does not explain how or why they should warrant a penalty less than dismissal. (See *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1002-1003, 1013; *Swanson v. Morongo Unified School District* (2014) 232 Cal.App.4th 954, 967-968.)[17]

Second, there is no evidence the ALJ failed to consider any relevant extenuating circumstance. It explained a "less severe penalty was fully considered," but that dismissal was appropriate based on her failure to accept responsibility and the "blatant nature of her deficient conduct." It also expressly considered her long career and good reputation. As for notice and disability, those would not be mitigating factors, for the reasons discussed *ante*. The ALJ presumably was aware it did not uphold all of the charges at issue, but Gilmore fails to explain why this should warrant a reduced penalty—particularly as multiple charges supporting dismissal *were* substantiated.

Finally, to the extent she seeks trial court findings here, her argument is particularly misguided. We directly review the ALJ's decision for abuse of discretion. (*Spanner*, *supra*, 119 Cal.App.4th at p. 591.) Gilmore did not request a statement of decision, meaning no trial court findings were required in general, but even if she had, those findings would not be dispositive to our analysis.

---

17    Gilmore does reference an employer's continuing obligation to accommodate disability and the settlement agreement memorializing her aide arrangement. As discussed *ante*, this is not a disability discrimination case, so these matters are not at issue.

33

DISPOSITION

The judgment is affirmed.  Respondents are awarded costs on appeal.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

O'ROURKE, J.